No. 23-1312

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

| QUINTIN SCOTT, | Appeal from the United States |
| Plaintiff-Appellant, | District Court for the Northern District of Illinois, Eastern Division |
| v. | 17 CV 7135 |
| THOMAS J. DART, *et al.,* | Honorable Martha M. Pacold, District Judge |
| Defendants-Appellees. | |

---

PETITION FOR REHEARING WITH SUGGESTION
FOR REHEARING EN BANC

---

KIMBERLY M. FOXX
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-3440

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JONATHON D. BYRER
Supervisor, Civil Appeals & Special Projects
CHRISTINA FAKLIS ADAIR
Deputy Supervisor, Civil Rights & Torts Litigation
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................ ……………………………………………i

TABLE OF AUTHORITIES ………………………………………………………………ii

RULE 35(b) STATEMENT ......................................................................1

BACKGROUND ......................................................................................1

ARGUMENT……………………………………………………………………………. 2

    I.     The Panel Majority's Decision Regarding Article III Standing Warrants Rehearing............................................................. 2

    II.    The Panel Majority's Analysis Of Commonality And Predominance Warrants Rehearing ...................................... 10

CONCLUSION ..................................................................................... 15

CERTIFICATE OF RULE 32 COMPLIANCE ........................................... 16

CERTIFICATE OF SERVICE ............................................................... 16

APPENDIX...........................................................................................A1

# TABLE OF AUTHORITIES

**Cases**                                                                                      Page(s)

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ................................................. 10, 13

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) ..................................................... 12

*Bus. Guides, Inc. v. Chromatic Communs. Enters.*, 498 U.S. 533 (1991) ................. 10

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ..................................................... 5

*Central R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885) ...................................passim

*In re Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir. 1992) .... 3, 4, 5

*Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437 (1987) ............................... 9

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006)............................................................ 15

*Delaughter v. Woodall*, 909 F.3d 130 (5th Cir. 2018) ................................................. 12

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011). .......................... 13

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ................................................................... 7

*Espenscheid v. DirectSat USA,* 688 F.3d 872 (7th Cir. 2012) .............................. 4, 5, 9

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999) ....... 7, 10

*Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)............................................................ 7

*Hall v. Hall*, 584 U.S. 59 (2018) ...........................................................................passim

*Int'l Union of Operating Engineers v. Associated General Contractors*,
845 F.2d 704 (7th Cir. 1988)........................................................................................ 8

*Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020) ................... 1, 2, 4

*Kemp v. Fulton Cty.*, 27 F.4th 491 (7th Cir. 2022) ..................................................... 12

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) ..................................................... 7

*McFields v. Dart*, 982 F.3d 511 (7th Cir. 2020) ......................................................... 14

*Ohio v. Robinette*, 519 U.S. 33 (1996) .......................................................... 13

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ........................................... 7

*Pavelic & Le Flore v. Marvel Entertainment Group*, 493 U.S. 120 (1989) ............... 10

*Sprague v. Ticonic Nat. Bank*, 307 U.S. 161 (1939) ..................................... 7

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ............... 5

*Texas Industries v. Radcliff Materials*, 451 U.S. 630 (1981) ....................... 7

*Trustees v. Greenough*, 105 U.S. 527 (1881) ......................................... passim

*Vt. Agency of Natural Res. v. United States*, 529 U.S. 765 (2000) ............... 5

*Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011) ...................................... passim

**Rules, Statutes and Other Authorities**

U.S. CONST. art. III .......................................................... passim

42 U.S.C. § 1983 ............................................................ 1

Fed. R. App. P. 32 .......................................................... 16

Fed. R. App. P. 35 .......................................................... 1

Fed. R. App. P. 40 .......................................................... 1

Seventh Circuit Rule 35 ..................................................... 1

Seventh Circuit Rule 40 ..................................................... 1

Fed. R. Civ. P. 8 ........................................................... 6

Fed. R. Civ. P. 23 .......................................................... passim

Fed. R. Civ. P. 54 .......................................................... 9

Fed. R. Civ. P. 60 .......................................................... 6

109 P.L. 2, 119 Stat. 4, 5(a)(3)(B) ......................................... 3

Ill. R. Prof. Cond. 1.8(e) ................................................................................ 4

*Symposium: Emerging Issues in Class Action Law: Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303 (2006) ................................... 3

**RULE 35(b) STATEMENT**

Pursuant to Fed. R. App. P. 35 and 40 and Circuit Rules 35 and 40, Defendants petition for panel rehearing and rehearing en banc of the decision issued in this matter by a split panel of this court.[1] The decision expressly repudiates *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020) regarding the authority of federal courts to make incentive awards to class representatives, conflicts with Supreme Court precedent regarding federal courts' equitable authority and the methodology for interpreting federal rules, and raises questions of exceptional importance regarding the judiciary's traditional equitable authority and Article III standing. In addition, it directly conflicts with precedent of the Supreme Court, and that of this court, regarding the proper analysis of commonality and predominance when certifying a class pursuant to Fed. R. Civ. P. 23(b)(3).

**BACKGROUND**

Appellant Quintin Scott filed suit in the district court alleging violations of his Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 for inadequate dental care relating to a referral to an off-site oral surgeon while detained at Cook County Jail. R. 30. Scott moved to certify under Rule 23(b)(3) a class of individuals "referred to an oral surgeon by a dentist at the Jail." R. 129 at 1. The district court denied that motion, concluding that Scott failed to establish any element of class

---

[1] We cite the district court record as "R. __," the appellate court rule as "7R. __," and the petition appendix as "A__."

1

certification under Rule 23. R. 164. Subsequently, the district court entered judgment, R. 187, based on Scott's acceptance of a conditional offer of judgment awarding him damages but reserving his right to appeal the district court's denial of class certification to pursue an additional "incentive award" as a class representative. R. 182.

Scott appealed, and the County asked that his appeal be dismissed for lack of Article III standing. As the County explained, Scott's only claimed injury was his inability to obtain an incentive award as class representative, but such injury was not redressable because federal courts lack authority to make incentive awards, absent a settlement, under longstanding Supreme Court precedent and the American rule. 7R. 17 at 13-19 (citing *Johnson*). Furthermore, the County explained, incentive awards give rise to serious conflicts of interest between class representatives and members of the class they represent. 7R. 17 at 20-21. Finally, the County noted that characterizing an incentive award as an award of costs or attorney's fees only confirmed Scott's lack of Article III standing because expenses incurred while pursuing litigation are not injuries for purposes of Article III. 7R. 17 at 17-18. The panel rejected these arguments and reversed, in a decision authored by now-retired Circuit Judge Wood, over the dissent of Judge Kirsch. A1-A36.

## ARGUMENT

## I.  The Panel Majority's Decision Regarding Article III Standing Warrants Rehearing.

Rehearing is appropriate in this case because the panel majority's decision resolves a question of exceptional importance—whether a putative class

representative's desire for an incentive award, standing alone, confers on him Article III standing to pursue an appeal from a denial of class certification—in a manner that conflicts with authority of the Supreme Court and another circuit, in several respects.

The importance of this question is readily apparent. The availability of incentive awards directly affects whether individuals will be willing to serve as class representatives, *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 571 (7th Cir. 1992), and thus can have a significant effect on whether class actions are brought. But incentive awards also undermine the legitimacy of the class actions they encourage, because such "awards may be used to further the attorneys' self-interest by rewarding malleable representative plaintiffs," *Symposium: Emerging Issues in Class Action Law: Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1310 (2006), who might prioritize those rewards over the interests of the class. Indeed, Congress has expressed serious concern about such awards. 109 P.L. 2, 119 Stat. 4, 5(a)(3)(B). Those concerns are particularly acute here – since Scott settled his damages claim and will not share in any further damages recovered by the class, he has a personal incentive to maximize his incentive award even if that diminishes the class recovery. The importance of these issues is only compounded by the fact that the availability of incentive awards here goes directly to this court's Article III jurisdiction.

The conflicts created by the panel majority's decision are equally apparent. Most obviously, the panel majority expressly renounced the Eleventh Circuit's

holding in *Johnson* that incentive awards are *per se* unlawful under longstanding

Supreme Court precedent. A12-A20. Specifically, *Johnson* recognized that *Trustees*

*v. Greenough*, 105 U.S. 527 (1881), and *Central R. & Banking Co. v. Pettus*, 113 U.S.

116 (1885), stand for a principle that is "fairly clear: A plaintiff suing on behalf of a

class can be reimbursed for attorney's fees and expenses incurred in carrying on the

litigation, but he cannot be paid a salary or be reimbursed for his personal

expenses." 975 F.3d at 1257. This clear rule, *Johnson* explains, forecloses incentive

awards, which are "roughly analogous to a salary—in *Greenough's* terms, payment

for 'personal services.'" *Id.* Indeed,

> modern-day incentive awards present even more pronounced risks
> than the salary and expense reimbursements disapproved in
> *Greenough*. Incentive awards are intended not only to compensate
> class representatives for their time (*i.e.*, as a salary), but also to
> promote litigation by providing a prize to be won (*i.e.*, as a bounty).

*Id.* at 1258.

The panel majority's decision also conflicts with this court's precedents. In

*Espenscheid v. DirectSat USA*, this court candidly admitted that "[n]o provision of

rule or statute authorizes incentive awards" in class actions, but treated such

awards as attorney's fees necessary for class action attorneys to obtain clients. 688

F.3d 872, 877 (7th Cir. 2012) (citing *Continental Illinois*, 962 F.2d at 571)).

However, after the County pointed out that treating incentive awards as attorney's

fees to reimburse payments to prospective clients violates longstanding ethical rules

prohibiting attorney payments to clients, 7R. 17 at 20 (citing Ill. R. Prof. Cond.

1.8(e)), the panel majority reversed course, declaring that incentive awards are

actually authorized by Fed. R. Civ. P. 23(e), and are costs, not attorney's fees. A10, A16. But notably, the panel majority did not overrule *Espenscheid* or *Continental Illinois* after circulation to the full court under Circuit Rule 40(e), leaving the law of this circuit in disarray – two published opinions say incentive awards are attorney's fees unauthorized by rule or statute, while another says that they are costs authorized by Rule 23(e).

Even setting aside these conflicts, rehearing would still be appropriate because the panel majority's opinion cannot be reconciled with Supreme Court precedent. To begin, the panel majority stated that incentive awards "compensate named plaintiffs for the *costs* incurred in performing their role as class representatives," A10 (emphasis added), but this puts the panel majority's ultimate conclusion regarding Article III standing in direct conflict with the Supreme Court's instruction that "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765 (2000). Under this rule, a desire for "reimbursement of the costs of litigation cannot alone support standing." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 108 (1998). If incentive awards merely reimburse class representatives for costs incurred while pursuing class litigation, as the panel majority believes, then those costs cannot support Article III standing. Indeed, as Judge Kirsch observed in his dissent, A32, two Justices have recognized that a desire for an "incentive award does not create article III standing," *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 178 n.1 (2016) (Roberts,

C.J., dissenting).

Moreover, to the extent that the panel majority believed that *Greenough* and *Pettus* were somehow "superseded" by Fed. R. Civ. P. 23, A15, this conclusion directly conflicts with Supreme Court precedent governing how to determine when the rules of civil procedure alter existing practice. As explained in *Hall v. Hall*, 584 U.S. 59 (2018), the interpretive rule that statutes do "not alter the fundamental details of an existing scheme with vague terms and subtle devices . . . is true in spades when it comes to the work of the Federal Rules Advisory Committees," *id.* at 74. As a result, the rules must never be read to "silently and abruptly reimagine" law prevailing when they were enacted. *Id.* at 75. Rather, the focus should be on the relevant rule's text and the accompanying Committee notes, because "when the Committee intend[s] a new rule to change existing federal practice, it typically explain[s] the departure." *Id.* at 74-75; *accord id.* at 74 (if rule was meant to "transform" existing law, "we would have heard about it"). In short, the question under *Hall* is whether there was a prevailing federal rule of practice when a rule of civil procedure at issue was drafted – if so, that rule must be interpreted as consistent with that practice unless its text or the Committee's comments indicate a clear intent to depart from that practice. *Compare, e.g.* Fed. R. Civ. P. 8 (rejecting code-pleading for notice pleading), *with* Fed. R. Civ. P. 60(b) (consolidating various common-law procedural devices for reopening judgments).

Despite this clear instruction as to how to interpret the rules of civil procedure in light of preexisting precedent, the panel majority declared pre-rules

"'equitable principles'" irrelevant because "there is no general federal common law." A15. Even setting *Hall* aside, this view directly contradicts Supreme Court precedent – while there is no federal common law creating "*substantive* rules," *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law still "exists . . . in . . . narrow areas," *Texas Industries v. Radcliff Materials*, 451 U.S. 630, 641 (1981), including matters of equity, which are governed by federal common law derived from traditional English practice, *Guaranty Trust Co. v. York*, 326 U.S. 99, 104-07 (1945).[2] Thus, federal courts lack the authority to "create remedies previously unknown to equity jurisprudence" when the Judiciary Act of 1789 was passed. *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 332 (1999). The common-fund doctrine delimited in *Greenough* and *Pettus* is a creature of equity, *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393 (1970) (quoting *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 166 (1939)), and is thus governed by the same common law that the panel majority wrongly denied – indeed, the same body of equitable common law from which the class action device was derived, *Ortiz*, 527 U.S. at 833 (discussing equitable origins of class actions). It has never been claimed here – neither by the panel majority nor Scott – that incentive awards were recognized at equity in 1789. Rather, the panel majority itself could only trace them

---

[2] We presume the panel majority misstated *Erie* – if Rule 23 replaced preexisting substantive rules, it is invalid under the Rules Enabling Act. But even the mere specter of invalidity illustrates the necessity of rehearing, since the Supreme Court has "counsel[ed] against adventurous application" of Rule 23 specifically to avoid conflicts with the Rules Enabling Act. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).

back as far as 1998. A14-15. Absent any indication that incentive awards were known to historical English equity jurisprudence, those awards are categorically beyond the equitable authority of the federal courts.

The panel majority's serious error in declaring itself unbound by traditional principles of equity is only compounded by *Hall*, which makes clear that federal common law is the starting point when interpreting rules of civil procedure. Having wrongly declared a whole body of federal common law nonexistent, the panel majority glossed over the fact that the common-fund doctrine discussed in *Greenough* and *Pettus* is a narrow equitable exception to the "American rule," which "requires parties to bear the costs of their litigation absent specific legislative or contractual authorization for shifting such costs to the losing party." *Int'l Union of Operating Engineers v. Associated General Contractors*, 845 F.2d 704, 709 (7th Cir. 1988). And as a result of overlooking that longstanding rule, the panel majority never identified anything – no statute, no language in Rule 23 generally, no language in Rule 23(h)'s specific provisions governing class-action costs, no language in the Committee's commentary – showing a clear intent to expand that equitable exception to the American rule and shift to class-action defendants the increased costs class representatives supposedly incur. Instead, the panel majority relied on the statement in Rule 23(e) that a *settlement* of a class claim may be *approved* only if it treats class members "equitably." A16. But this case does not involve approval of a settlement, so Rule 23(e) does not even apply, let alone control, and reliance on a rule regarding settlement to authorize incentive awards more

generally directly conflicts with *Hall*'s requirement that a clear intent of the rules' drafters be shown before unsettling existing practice.

Nor can such a clear statement be found in either of the federal rules regarding awards of costs. Long ago, the Supreme Court held that the language of Federal Rule of Civil Procedure 54 regarding costs does not permit awards of costs that are not specifically authorized by federal statutes, but rather only grants courts discretion to deny the costs those statutes allow. *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987). It is undisputed that the incentive awards Scott seeks here are not authorized by any federal statute, *see Espenscheid*, 688 F.3d at 877, so they could not be awarded under Rule 54. That leaves only Rule 23, but the language of that rule is *narrower* than the language of Rule 54 – it permits only the award of costs that are "authorized by law" when, as here, there is no agreement among the parties allowing greater costs. Fed. R. Civ. P. 23(h); *accord id.*, Notes of Advisory Committee on 2003 amendments (explaining that Rule 23(h) "does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties.").

Having stripped away the panel majority's proffered legal justifications for incentive awards, all that remains is a naked policy assertion that an incentive award to Scott was "necessary to induce him to participate in the suit" because "without a named plaintiff there can be no class action." A17 (quotation marks omitted). Whatever this assertion's merits as a matter of policy, Rule 23's text does

not endorse that policy, and that textual void is determinative as to that Rule's effect, *Bus. Guides, Inc. v. Chromatic Communs. Enters.*, 498 U.S. 533, 541 (1991), because "[c]ourts are not free to amend a rule outside the process Congress ordered," *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997), when the judicial "task is to apply the text, not to improve upon it," *Pavelic & Le Flore v. Marvel Entertainment Group*, 493 U.S. 120, 126 (1989). And notions of equity cannot be used to create a remedy not authorized by Rule 23 and "accord a type of relief that has never been available before," since creation of a new remedy in the guise of equity would be an exercise not of judicial "flexibility but of omnipotence," *Grupo Mexicano*, 527 U.S. at 322, an exercise of "despotic and sovereign authority" bound not by the law but by an individual judge's "notions and conscience," *id.* at 332 (cleaned up).

In short, the panel majority's opinion wreaks havoc on Supreme Court and circuit precedent, all in service of the panel majority's personal policy preference for class actions. Rehearing is thus warranted.

## II.    The Panel Majority's Analysis Of Commonality And Predominance Warrants Rehearing.

The panel majority's analysis of commonality and predominance under Rule 23 also warrants rehearing because it directly conflicts with Supreme Court and circuit precedent on a significant issue – namely, the propriety of class certification of claims arising out of a facially lawful municipal policy regarding correctional medical care – in a way that will have far-reaching effects on class certification in this circuit. In effect, the panel majority has effectively guaranteed class

certification whenever the class can identify a lawful municipal policy in the chain of causation leading to their injuries.

Beginning with commonality, the panel majority's decision is irreconcilable with the Supreme Courts' decision in *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011), which makes clear that commonality is not demonstrated by merely identifying a facially lawful policy in the chain of causation leading to the plaintiffs' injuries. As *Dukes* explains, commonality can be shown only by proof that the class members "have suffered the same injury." *Id.* at 349-350. Specifically, it requires identification of a common contention "of such a nature that it is capable of classwide resolution, which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Merely identifying a facially lawful policy applicable to the entire class does not suffice – while such a policy "can be the basis" for a class's claim, the mere fact that a "claim 'can' exist" does not show commonality. *Id.* at 355. Employees implementing a facially lawful policy might execute that policy in different ways, some of which are lawful and some of which are not, and showing that one employee's particular conduct violated the law while implementing a lawful policy "will do nothing to demonstrate" that another employee also acted unlawfully under that policy. *Id.* at 355-56. As a result, in such circumstances, the class will be "unable to show that all [the members'] claims will in fact depend on the answers to common questions." *Id.* at 356.

Here, the panel majority did not acknowledge that *Dukes* requires the

commonality inquiry to focus on injury, but instead deemed the commonality requirement satisfied because "the Jail's decision not to put an oral surgeon on staff is a uniform policy that applies to every detainee at the Jail," and "causes systemic treatment delays for detainees who have been referred by a dentist to receive treatment from an oral surgeon." A24. But all this says is that the policy *can* be the basis for a Fourteenth Amendment claim, since mere delays in medical treatment do not necessarily constitute deliberate indifference. "Anyone who has ever visited a doctor's office knows that some delays in treatment are inevitable, particularly absent a life-threatening emergency. Such delays are even more likely in the prison environment." *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) (addressing dental care claim).

Rather, a delay in medical treatment arises to deliberate indifference only if it results from (1) an intentional decision regarding conditions of confinement; (2) that creates a substantial risk of serious harm; *and* (3) no additional, objectively reasonable measures were taken to abate that risk. *Kemp v. Fulton Cty.*, 27 F.4th 491, 496 (7th Cir. 2022); *accord, e.g., Delaughter v. Woodall*, 909 F.3d 130, 138 (5th Cir. 2018) ("delay in medical care constitutes deliberate indifference . . . if a prison official disregards a substantial risk of serious harm by failing to take reasonable measures to abate it"). In other words, and directly contrary to the panel majority's belief that reasonableness can be assessed solely by looking at a municipal policy in a vacuum, A24-25, the deliberate indifference analysis *always* requires a court to look beyond the mere existence of a policy regarding conditions of confinement, to

assess how any risks created by that policy are abated. As a result, the decision to not employ certain medical specialists like an oral surgeon can – and often will – result in entirely reasonable delays in medical treatment, if objectively reasonable abatement measures have been taken to mitigate the resulting risk. And it is well settled that objective reasonableness will necessarily vary from case to case, depending on a host of individualized factors. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (collecting authority). Under *Dukes*, the fact that individualized decisions must be considered to determine whether a legal violation took place, despite the presence of a policy applicable to all class members, defeats commonality, but the panel majority simply wrote off those individualized decisions as irrelevant.

The panel majority's analysis of predominance was even more starkly in contrast with Supreme Court precedent. While predominance is analytically similar to commonality, it "is far more demanding," *Amchem Prods.*, 521 U.S. at 624, and "begins, of course, with the elements of the underlying cause of action[.]" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). But the panel majority said nothing about the elements of Scott's claims in concluding that predominance was satisfied here, and as a result incorrectly said that the objective reasonableness of the policy not to hire an oral surgeon "can be resolved on a classwide basis" without consideration of how risks were abated in any particular individual's case. A30. In other words, the panel majority believed that actions taken to abate any risks caused by the decision not to employ an in-house oral surgeon were simply irrelevant to the constitutional analysis. That conclusion was already gravely wrong

when it concerned only commonality – indeed, it implies that the panel majority believed that the Constitution requires all jails and prisons to keep on-site a full panoply of surgeons and medical specialists – and that error was only exacerbated when treated as sufficient to satisfy predominance.

None of this should have been controversial here, as this court already held in *McFields v. Dart*, 982 F.3d 511 (7th Cir. 2020), that, under *Dukes*, a constitutional claim that a medical-care policy is "objectively unreasonable . . . is, *by its nature*, an inquiry not suitable for resolution as to all class members in one fell swoop," *id.* at 516 (emphasis added). The panel majority took issue with that conclusion, A30, but no panel of this court can overrule prior precedent absent circulation under Circuit Rule 40(e), *National Cycle v. Savoy Reinsurance Co.*, 938 F.2d 61, 64 (7th Cir. 1991). And while the panel majority tried to avoid this requirement by distinguishing *McFields* on the ground that it did not actually involve any municipal policy, only "individualized" problems, A24, *McFields* took no position on that question, which went solely to the ultimate *merits* of the plaintiffs' *Monell* claims and thus was not a proper question for resolution on class certification. To the contrary, *McFields* made clear that the existence of a policy was an open question that, like objective reasonableness of a policy, could not justify class certification. 982 F.3d at 516. And to the extent the panel majority thought that a policy could not have existed in *McFields* merely because only "most" detainees, but not all, were subject to the challenged practice, A24, that creates yet another conflict with circuit precedent, which is clear that a "general pattern"

suffices, *e.g.*, *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006). That the panel could justify its improper departure from one circuit precedent only by running headlong into another is yet another example of the havoc the panel majority has wrought on Supreme Court and circuit precedent, and should eliminate any lingering doubt that rehearing is necessary.

## CONCLUSION

This court should grant panel rehearing or rehearing en banc.

Respectfully submitted,

Kimberly M. Foxx
State's Attorney of Cook County

By: */s/ Christina Faklis Adair*
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4634

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 3894 words, beginning with the words "Rule 35(b) Statement" on page 1 and ending with the words "Respectfully submitted" on page 15. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

*/s/ Christina Adair*
CHRISTINA ADAIR, Attorney

## CERTIFICATE OF SERVICE

I certify that on June 3, 2024, I electronically filed the attached Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Christina Adair*
CHRISTINA ADAIR, Attorney

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-1312

QUINTIN SCOTT,

*Plaintiff-Appellant*,

*v.*

THOMAS J. DART, Sheriff of Cook County, and COOK COUNTY, ILLINOIS,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-07135 — **Martha M. Pacold**, *Judge*.

———————————

ARGUED DECEMBER 7, 2023 — DECIDED APRIL 29, 2024

———————————

Before WOOD, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges*.

WOOD, *Circuit Judge*. Quintin Scott, a former pretrial detainee at the Cook County Jail, filed this class action more than six years ago. Invoking 42 U.S.C. § 1983, Scott asserts that Cook County and its sheriff (collectively, the "County") provided him and other pretrial detainees inadequate dental care in violation of the Fourteenth Amendment. The district court

A1

refused to certify the class, and soon after, Scott voluntarily settled his individual claim. But the settlement reserved his right to appeal the adverse class ruling and to seek an incentive award for his role as named plaintiff.[1] Scott followed through with this timely appeal.

The County contends that Scott lacks Article III standing to pursue the class aspects of this case. It asserts that Scott no longer has a live interest in the litigation, and that even if he did, we could not redress his injury because nineteenth-century Supreme Court precedent forbids courts from granting "incentive awards." We find these arguments unpersuasive, largely because we do not agree with the County's reading of the Supreme Court's decisions. We see no reason to stray from nearly half a century of case law in which courts across the country have granted incentive awards to named plaintiffs in class actions.

We also conclude that the district court abused its discretion in denying class certification, as it misapplied our decision in *McFields v. Dart*, 982 F.3d 511 (7th Cir. 2020), and based its decision on too strict a standard. If the district court's approach were correct, it would never be possible to certify a class of detainees alleging that they were denied adequate medical care because medical care, by its nature, is individualized. We therefore vacate the district court's order and remand for further proceedings.

---

[1] The original named plaintiff in this case was Montrell Carr. Scott joined the case in an amended complaint filed on July 13, 2018. After the district court denied class certification, Carr settled his claim and accepted an unconditional offer of judgment. Carr's settlement did not reserve his right to appeal; this leaves Scott as the sole named plaintiff.

## I

Cook County Jail (the "Jail") is one of the nation's largest single-site jails, housing approximately 9,500 detainees at any given time. As custodian of the Jail, the County has a constitutional obligation to provide its detainees with adequate medical care. See *Daniel v. Cook County*, 833 F.3d 728, 733 (7th Cir. 2016). But unfortunately, it has not always met that obligation. In 2008, the U.S. Department of Justice ("DOJ") concluded after an investigation that the Jail maintained grossly deficient policies and practices that denied constitutionally adequate medical care to detainees.[2] The DOJ's extensive findings have since served as the basis for an onslaught of litigation brought by detainees challenging various aspects of the Jail's policies and practices. See, *e.g.*, *United States v. Cook County*, 761 F.Supp.2d 794 (N.D. Ill. 2011). In 2010 the County and the DOJ entered into a consent order, in which the County agreed to allow regular monitoring by the federal government and to ensure adequate medical staff at the Jail.

That brings us to this lawsuit, which takes aim at the County's refusal for more than a decade to keep an oral surgeon on staff at the Jail. Back in 2006, the County employed four dentists and one oral surgeon to serve the Jail's detainees. The oral surgeon performed a variety of procedures that general dentists do not perform, including difficult extractions and diagnoses of other complex dental cases. In 2007, however, the County reduced the dental staff to just one dentist,

---

[2] See Letter from Grace Chung Becker, Acting Assistant Att'y Gen., Civil Rights Div., U.S. Dep't of Just., to Thomas Dart, Cook County Sheriff, and to Todd H. Stroger, Cook County Board President (Jul. 11, 2008) (available at https://www.justice.gov/sites/default/files/crt/legacy/2011/04/13/CookCountyJail_findingsletter_7-11-08.pdf).

whose services were limited to extractions. Although the County eventually hired more dentists, as part of its effort to comply with the DOJ's consent order, it did not fill the oral surgeon position at the Jail. By March 12, 2020—the end date of the proposed class—the County still had not hired an oral surgeon for the Jail. (The record does not indicate whether this remains the case today.) With no on-site oral surgeon, the County adopted a new practice: if an on-site dentist examined a detainee and determined that the detainee required treatment from an oral surgeon, the dentist would then refer the detainee to the oral surgery clinic at John H. Stroger, Jr., Hospital of Cook County ("Stroger Hospital").

Scott alleges that the lack of an on-site oral surgeon has caused him and other detainees to experience unnecessary pain and significant delays in receiving treatment. He has presented evidence to show that County officials were aware of the need for an on-site oral surgeon but turned a blind eye to the suffering of detainees, many of whom waited months before being transported to Stroger Hospital for treatment. For example, the Jail's Chief of Dental Services submitted a budget request in June 2011, urging that the County hire an oral surgeon to address the "constant[] suffer[ing]" of detainees who waited "anywhere from 2 to 3[] months to be treated" at Stroger Hospital. The Jail's Director of Oral Health echoed these concerns in an email in April 2016, stating that the Jail was "in DESPERATE need for a part-time oral surgeon" (emphasis in original).

Scott was housed at the Jail from June 23, 2013, to May 22, 2014. He began to experience severe tooth pain during that period. On August 6, 2013, Scott submitted a Health Service Request Form explaining that he had difficulty eating, that his

tooth "throbbed all night long," and that it "hurts like hell." An on-site dentist examined Scott two days later, determined that he needed surgery to have his wisdom teeth removed, and referred him to Stroger Hospital. Three months later, Scott still had not received treatment. He submitted a grievance on November 18, 2013, complaining: "I am suffering!!! I am in pain, can't lie down and eat properly, and have frequent headaches." On December 8, 2013, Scott submitted a second grievance stating: "I have yet to see the oral surg[eon] and the pain is getting to be unbearable. I am suffering!!!" Scott finally received the treatment he needed from an oral surgeon on March 28, 2014, seven months after the dentist had referred him for treatment.

As further support for his allegations, Scott has submitted the written grievances of 11 detainees who also endured significant delays in receiving oral surgery. Each of these detainees was examined by an on-site dentist, was referred to Stroger Hospital for treatment by an oral surgeon, and experienced delays ranging from four to 19 weeks in receiving that treatment. Because these detainees' experiences are relevant to the issues on appeal, we recount a few of them. (We refer to each grievant by the initials of their first and last names because the County produced the underlying documents subject to a confidentiality order.)

J.C. submitted the following grievance on April 29, 2014:

I have wires on my mouth that I have been asking the Doctor and nurses if I can go to Stroger Hospital to have them remove because they are cutting my gums and make them bleed, and they causing me pain every time I eat. … On April 17, 2014, Dr. Martinez told me

that he was going to send me to the specialist in Stroger but I still haven't gone.

J.C. was not taken to Stroger Hospital until August 15, 2014, more than 17 weeks after his referral was entered.

T.P. submitted a grievance on March 17, 2015, complaining:

> Today I went and seen Dental, Dr. Montgomery, because I have a rotten tooth that needs to be pulled. She agreed it needs to be pulled. Yet she did not do it. She said I was being referred to a oral surgeon which would 4-6 months, which is unethical as well as deliberate medical neglect. I do not have enough pain medicine for pain. As well as I can't drink anything cold. To drink water it has to be hot. I'm having problems sleeping due to pain … .

T.P. was not taken to the oral surgeon until May 19, 2015, nine weeks after he was referred to Stroger Hospital.

Similarly, C.O. submitted a grievance on January 2, 2018, complaining that he was "still in tremendous pain" as he had been waiting weeks to have his wisdom tooth removed. An official at the Jail responded to C.O.'s grievance a few weeks later, telling C.O that he should continue to take the acetaminophen that he had been prescribed for his pain. C.O. appealed, reiterating that he was "still in terrible pain." On February 15, 2018, a grievance officer at the Jail issued a response stating that the "Decision stands. Appts for oral surgery can take 90 days or more."

After discovery, Scott sought to certify the following class under Federal Rule of Civil Procedure 23(b)(3):

All persons who were detained at the Cook County Jail
at any time between November 1, 2013 and March 12,
2020 and, after having been referred to an oral surgeon
by a dentist at the Jail, awaited treatment at the Stroger
Hospital Oral Surgery Clinic, excluding those persons
who are members of the subclass certified in *Whitney
v. Khan*, 18-cv-4475, N.D. Ill., Mem. Op. March 25, 2020,
ECF No. 175.[3]

Although Scott has not pinpointed a definite number of
plaintiffs in the proposed class, he asserts that we can estimate
its size based on two spreadsheets the County provided dur-
ing discovery. The first indicates that dentists at the Jail made
2,080 referrals to Stroger Hospital between February 20, 2014,
and July 7, 2017; the second identifies 2,186 detainees who
were scheduled to be transported from the Jail to the oral sur-
gery clinic at Stroger Hospital between January 3, 2013, and
October 9, 2019. Adding these figures together, the district
court assumed for purposes of assessing class certification
that the class contains anywhere from 2,080 to 4,266 members.

Despite those numbers, the district court refused to certify
the class. Relying heavily on our decision in *McFields*, it found

---

[3] *Whitney v. Khan* was a similar classwide challenge in which detainees
at the Jail's Residential Treatment Unit ("RTU") alleged that they had re-
ceived inadequate dental care. The district court certified a class of detain-
ees who "submitted a written 'Health Service Request Form' processed as
'urgent' by the RTU dental assistant and who did not receive an evalua-
tion by a dentist for at least 14 days after submitting the request." Relevant
here, the district court later certified a subclass of detainees "who were
subsequently referred by the RTU dentist to the Stroger Hospital Oral Sur-
gery Clinic." The district court approved a class settlement in *Whitney* on
August 5, 2021. See *Whitney*, 18-cv-4475, ECF No. 318.

that the proposed class failed to meet the commonality, typi-
cality, predominance, and superiority requirements of Rule
23. It first observed that given the nature of the plaintiffs'
claims, they could not prevail unless they established that the
County's policy decision not to keep an oral surgeon on staff
at the Jail was objectively unreasonable. It then jumped to the
question whether each class member received objectively un-
reasonable care. The second point, it thought, turns on indi-
vidualized factors such as the type of dental problem, the se-
riousness of the condition, and the urgency of the need for
treatment. The necessity of moving to the person-by-person
level defeated the effort to show a common question capable
of classwide resolution, in the court's view. The same problem
afflicted the plaintiffs' efforts to establish the elements of typ-
icality, predominance, and superiority.

Scott accepted a conditional offer of judgment following
the district court's ruling. See FED. R. CIV. P. 68. In that agree-
ment, Scott agreed to settle his individual claim for $7,500 but,
as we noted earlier, he expressly reserved his right to appeal
the denial of class certification and to seek an incentive award
for his role as a named plaintiff.

## II

Before turning to the principal issue on appeal, we must
ensure that we have Article III jurisdiction over this matter.
Article III confines the federal courts to resolving "the legal
rights of litigants in actual controversies." *Genesis Healthcare
Corp. v. Symczyk*, 569 U.S. 66, 71 (2013). Standing doctrine
gives effect to this limitation. To establish standing, the plain-
tiff must "have (1) suffered an injury in fact, (2) that is fairly
traceable to the challenged conduct of the defendant, and (3)
that is likely to be redressed by a favorable judicial decision."

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements must be present at all stages of the litigation, not just at its inception. *Genesis Healthcare Corp*., 569 U.S. at 71.

The County urges that Scott lacks standing for two reasons. First, it asserts that Scott no longer has a live interest in the case because he settled his individual claim and can obtain only an incentive award if the class ultimately prevails. Second, the County contends that to the extent Scott has an injury, it is an incentive award banned by two Supreme Court cases (decided well before the advent of Rule 23): *Internal Improvement Fund Trustees v. Greenough*, 105 U.S. 527 (1881), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885). We find neither point persuasive.

### A.  Injury in fact

As the County concedes, we already have concluded that the prospect of an incentive award is enough to support the named plaintiff's concrete interest in the litigation. See *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876–77 (7th Cir. 2012). In *Espenscheid*, the named plaintiffs voluntarily settled their claims with the defendants after the district court denied class certification. When the named plaintiffs later appealed that ruling, the defendants argued that they no longer had a cognizable interest in the continuation of the suit. We rejected that argument because a provision of the settlement agreement permitted the named plaintiffs to seek an incentive award for their services as class representatives. *Id.* at 874. "The prospect of [an incentive] award," we concluded, "is akin to a damages payment agreed in a settlement to be contingent upon the outcome of the appeal; and the prospect of such a payment, though probabilistic rather than certain, suffices to confer standing." *Id.* at 875.

In reaching that conclusion, we explained that incentive awards are designed to compensate named plaintiffs for the costs incurred in performing their role as class representatives—costs above and beyond what they would bear as ordinary class members. *Id.* at 876–77. These costs include the time and effort that named plaintiffs must spend learning about the case (class members must have enough familiarity with the case to satisfy the "adequacy" requirement of Rule 23(a)(4)); sitting for depositions; complying with discovery requests; monitoring class counsel; and reviewing and approving any proposed settlement agreements. 5 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 17:3 (6th ed., Nov. 2023 update); Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1305–06 (2006).

Incentive awards compensate the named plaintiff for bearing certain risks inherent in stepping forward to represent the class: "should the suit fail, [the named plaintiff] may find himself liable for the defendant's costs or even, if the suit is held to have been frivolous, for the defendant's attorneys' fees." *Espenscheid*, 688 F.3d at 876 (first citing *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996); and then citing *Blue v. United States Dep't of the Army*, 914 F.2d 525, 534 (4th Cir. 1990)). And in certain contexts, such as employment discrimination actions, incentive awards may also recognize the added risks of retaliation or stigmatization that named plaintiffs assume in participating in a lawsuit against their current or former employers. See Eisenberg & Miller, *supra*, at 1305; see also RUBENSTEIN § 17:3 n.17 (collecting district court cases awarding incentive fees on this basis).

No. 23-1312                                                           11

We further emphasized in *Espenscheid* that preventing the settling plaintiff from appealing would undermine judicial economy, "since if the named plaintiffs settle after denial of class certification and then exit the scene another member of the class can step forward and take the quitters' place." 688 F.3d at 877–78. Along the same lines, the Supreme Court has held that defendants cannot moot an appeal from a denial of class certification by simply buying off the individual claims of the named plaintiffs. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). "Requiring multiple plaintiffs to bring separate actions," the Court reasoned, "obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement." *Id.*

Since *Espenscheid*, we have reaffirmed that the "the possibility of an incentive award … is enough of an interest to keep the claim justiciable." *Weil v. Metal Technologies, Inc.*, 925 F.3d 352, 357 (7th Cir. 2019); see also *Wright v. Calumet City*, 848 F.3d 814, 819 (7th Cir. 2017). To be sure, we clarified in *Wright* that the settlement agreement must expressly reserve the rights of the named plaintiffs to pursue an incentive award on appeal in order to secure standing. See 848 F.3d at 819–20. But that is not a problem here, as the settlement agreement did just that.

The County nonetheless argues that Scott has not suffered an injury in fact because he has not provided "*any* services to the class" that would entitle him to an incentive award. The record dispels that assertion. Scott joined the case as a named plaintiff nearly six years ago. Since then, Scott has prepared for and sat for a deposition, monitored and conferred with class counsel, and assisted with discovery. Though these

services may "not [be] onerous," and though "the risk of incurring liability [should the suit fail] is small," we have held that even modest services justify an incentive award. See *Espenscheid*, 688 F.3d at 877; see also *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013) (noting that incentive awards compensate class representatives "for what usually are minimal services"). This is enough to show that Scott has an ongoing stake in the litigation.

### B.  Redressability

We also are unpersuaded by the County's view of redressability. The County argues that the Supreme Court's decisions in *Greenough* and *Pettus* forbid federal courts from granting incentive awards to named plaintiffs in class actions. It finds support for this argument in a recent decision from the Eleventh Circuit, which extended those late-nineteenth-century cases to reach the surprising conclusion that incentive awards are *per se* unlawful. See *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020).

To make sense of *Johnson*, we must first look carefully at *Greenough* and *Pettus*. These two cases recognized the "common-fund doctrine." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Under this doctrine, which is rooted in restitution principles, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Id.*

In *Greenough*, the Supreme Court identified limits on the type of fee that a litigant may recover from a common fund. The case involved a creditor, Francis Vose, who filed a suit on behalf of himself and other bondholders for alleged

mismanagement of a common fund on the part of the trustees. 105 U.S. at 528. Vose, the Court said, carried on the litigation "with great vigor and at much expense" and ultimately "secured and saved" much of the trust fund, to the benefit of the other bondholders. *Id.* at 529. He then asked the district court for an "allowance out of the fund for his expenses and services." *Id*. The district court awarded Vose attorneys' fees, litigation expenses, an allowance of $2,500 a year for ten years for "personal services," and "personal expenditures" of $15,003.35 for his travel expenses incurred while litigating the case. *Id.* at 530.

On appeal, the Supreme Court affirmed the district court's award of attorneys' fees and litigation expenses, explaining that forcing Vose to bear those costs "would not only be unjust to him," but would confer "an unfair advantage" on all the bondholders who had reaped the benefits of his efforts. *Id.* at 532. The Court further reasoned that these expenses were recoverable because common-law trust cases had established "a general principle that a trust estate must bear the expenses of its administration." *Id.* at 532–33. But the Court reversed the award of "personal services and private expenses," which it saw as akin to a "salary." *Id.* at 537–38. The Court explained that, unlike the attorneys' and litigation fees, "no authority whatever" permitted the award of a salary to a named plaintiff, and such awards would "present too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interest of creditors[.]" *Id.* at 537–38.

The Court decided *Pettus* a few years later. There, it confirmed that attorneys could recover expenses for their efforts on behalf of clients from the common fund. 113 U.S. at 127–

28. *Pettus* said nothing about what private plaintiffs could recover, and so its relevance to this case is minimal.

Fast forward about 140 years to 2020. That was the year in which the Eleventh Circuit's *Johnson* decision muddied the waters by unexpectedly declaring that the modern-day incentive award is "roughly analogous" to the "salary" (or "personal services and private expenses") that were prohibited in *Greenough*. 975 F.3d at 1244. "If anything," it said, "modern-day incentive awards present even more pronounced risks than the salary and expense reimbursements disapproved in *Greenough*" because "[i]ncentive awards are intended not only to compensate class representatives for their time (*i.e.*, as a salary), but also to promote litigation by providing a prize to be won (*i.e.*, as a bounty)." *Id.* at 1258. Although the court acknowledged that incentive awards are virtually ubiquitous in class-action cases today, it found that this "state of affairs is a product of inertia and inattention, not adherence to law." *Id.* at 1259. The County now urges us to adopt this application of *Greenough* and *Pettus*.

We decline that invitation. As the court in *Johnson* admitted, there is a long-standing practice of awarding incentive fees to named plaintiffs in class actions. Indeed, up until *Johnson*, we and the rest of our sister circuits accepted the fact that district courts have the authority to grant incentive awards to named plaintiffs. See, *e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming a class representative's $25,000 incentive award); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (*en banc*); *Berry v. Schulman*, 807 F.3d 600, 613–14 (4th Cir. 2015); *Jones v. Singing River Health Servs. Found.*,

865 F.3d 285 (5th Cir. 2017) (vacating a class-action settlement with an incentive award on other grounds and affirming the same settlement after the district court provided further explanation in 742 F. App'x 846 (5th Cir. 2018)); *Pelzer v. Vassalle*, 655 F. App'x 352, 361 (6th Cir. 2016) (unpublished); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867–68 (8th Cir. 2017); *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1057 (9th Cir. 2019); *Tennille v. Western Union Co.*, 785 F.3d 422, 434–35 (10th Cir. 2015); *Cobell v. Salazar*, 679 F.3d 909, 922–23 (D.C. Cir. 2012).

The opinions in these cases demonstrate that this consensus was not a "product of inertia and inattention." *Johnson*, 975 F.3d at 1259. It instead reflects a significant historical development. As the Second Circuit recently explained, "*Greenough* and *Pettus* have been superseded, not merely by practice and usage, but by Rule 23, which creates a much broader and more muscular class action device than the common law predecessor that spawned nineteenth-century precedents." *Moses v. New York Times Company*, 79 F.4th 235, 254–55 (2d Cir. 2023); see also *Johnson v. NPAS Solutions, LLC*, 43 F.4th 1138, 1144–50 (11th Cir. 2022) (mem.) (Jill Pryor, J., dissenting from denial of rehearing *en banc*) (explaining that the panel decision in *Johnson* "fail[ed] to account for the historical development of incentive awards").

Recall that the *Greenough* Court distinguished attorneys' fees and litigation expenses from "personal services and private expenses" in part by noting that there was "no authority whatever" that allowed for litigants to be compensated in common-fund cases. 105 U.S. at 537. At the time, "courts were confined to the application of federal general common law and equitable principles." *Moses*, 79 F.4th at 254. Today, there is no general federal common law, see *Erie R. Co. v. Tompkins*,

304 U.S. 64, 78 (1938), and Rule 23 creates the framework for modern class actions. *Moses*, 79 F.4th at 254–55.

Although Rule 23 does not use the phrase "incentive award," courts have long recognized that named plaintiffs may receive compensation for shouldering the time-consuming burdens of litigation and assuming risks of financial, and potentially reputational, harm. See RUBENSTEIN § 17:3. In 2018, Rule 23(e) was amended to ensure that a district court may approve a settlement only if it "treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D). Incentive awards are consistent with this mandate because the named plaintiffs invest in the case more heavily than their unnamed counterparts. *Moses*, 79 F.4th at 253.

The County would have us overlook the changes that accompanied the historical shift from common-law to Rule 23 class actions. In its view, the common-fund cases look enough like class actions that we should simply extend the common-law doctrine to this wholly new context. But we are unwilling to divorce those cases from the context in which they were decided. As the Supreme Court has reminded us, courts must "read general language in judicial opinions ... as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." See *Illinois v. Lidster*, 540 U.S. 419, 424 (2004).

This is not the first time we have rejected the argument that the Supreme Court's common-fund-doctrine cases prohibit incentive awards. In *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 571 (7th Cir. 1992), the named plaintiff appealed the district court's refusal to award him a $10,000 fee for "modest services" as class representative. We began

our analysis of that issue by considering "whether a named plaintiff is ever entitled to [such] a fee" in light of the Supreme Court's common-fund cases:

> The usual formulations of the common-fund doctrine describe the plaintiff rather than his lawyer as the person entitled to be compensated for the expenses he has incurred in conferring a benefit on the (other) beneficiaries of the common fund. See, *e.g.*, *Trustees of the Internal Improvement Fund v. Greenough*, 105 U.S. 527 (1882); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Boeing Co. v. Van Gemert*, 444 U.S. at 478 (1980). The principal expense is the attorney's fee, but there can be others, provided they are not personal. *Greenough*, 105 U.S. at 537–38; *Granada Investments, Inc. v. DWG Corp.*, No. 91–3297, slip op. at 9 (6th Cir. April 30, 1992). Since without a named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable.

*In re Continental Illinois Securities Litigation*, 962 F.2d at 571 (citations cleaned up).

In other words, we concluded that the modern-day incentive award is akin to the kind of monetary award that the Supreme Court blessed in *Greenough*, not the "personal expenses" it disapproved.

The County dismisses our conclusion in *In re Continental Illinois Securities Litigation* as *dicta*, but even if we take a fresh look at the issue, we find the proposed analogy between

"personal services and private expenses" and incentive awards to be faulty. The County argues that incentive awards are problematic because the "personal interests [of named plaintiffs] will make them willing to compromise the interests of the class for their own personal gain." But the *Greenough* Court had in mind a much different concern—that awarding the creditor "personal services and private expenses" would "present too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interest of creditors[.]" 105 U.S. at 538. Put another way, "the [*Greenough*] Court was concerned that such awards would induce creditors to interfere with the management of funds that had already been entrusted to trustees charged with fiduciary duties to act in the best interests of the creditors." *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 352–53 (1st Cir. 2022). The problem was not that the creditor would not adequately represent the interests of the other creditors but rather that the creditor "was not a trustee." *Greenough*, 105 U.S. at 537.

The drafters of Rule 23 were well aware that conflicts of interest might arise between class representatives and class members. The rule contains significant safeguards against those risks. It prohibits a court from approving a settlement agreement unless it is "fair, reasonable, and adequate." That directive applies with full force to incentive awards. Fed. R. Civ. P. 23(e)(2). In addition, courts have developed tests for assessing the appropriateness of an incentive award on a case-by-case basis. See Rubenstein § 17:13 (collecting tests used by different circuits). In the Seventh Circuit, for example, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and

effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016. Rule 23(e) thus ensures that an incentive award cannot be so large that it amounts to a "salary." *Greenough*, 105 U.S. at 538.

These safeguards are not just theoretical. The most recent empirical study on incentive awards reviewed approximately 1,200 class actions from 2006 to 2011 and found that the median incentive award per named plaintiff was $5,250 (or $7,125 in 2023 dollars). See RUBENSTEIN § 17:8. In contrast, the 10-year allowance of $2,500 for "personal services" and award of $15,003.35 for "personal expenditures" that the Supreme Court disapproved of in *Greenough* in 1881, 105 U.S. at 530, are equivalent to more than $1.4 million today.

The Eleventh Circuit also expressed concern that incentive awards may act as a "bounty" for bringing litigation. *Johnson*, 975 F.3d at 1258. But in so doing, it brushed aside the fact that incentive awards are consistent with the core purpose of Rule 23—"to encourage claimants with small claims to vindicate their rights and to hold unlawful behavior to account." *Murray*, 55 F.4th at 353; see also *Moses*, 79 F.4th at 253 (explaining that class-action lawsuits are "designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries." (first quoting S. Rep. No. 109-14, at 5; and then citing 1 JOSEPH MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 1:1 (19th ed. 2022))). A categorical ban on incentive awards would undermine that purpose.

We are not alone in rejecting efforts to extend *Greenough* and *Pettus* to the class-action context. In the wake of *Johnson*,

three of our sister circuits have expressly rejected the Eleventh Circuit's interpretation of those cases. See *Murray*, 55 F.4th at 352–53; *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 785–87 (9th Cir. 2022); *Moses*, 79 F.4th at 253–55. Moreover, the Supreme Court recently noted (albeit in a case that did not squarely present the issue) that "[t]he class representative might receive a share of class recovery above and beyond her individual claim." See *China Agritech, Inc. v. Resh*, 584 U.S. 732, 747 n.7 (2018) (citing *Cook*, 142 F.3d at 1016). Against all of this, the Eleventh Circuit's blanket approach to incentive awards is anomalous.

Consistent with historical practice, our precedent, and the majority view on the issue, we conclude that incentive awards to named plaintiffs are permitted so long as they comply with the requirements of Rule 23. Such an award can redress the injury asserted in this case, and so standing is secure.

### III

We now turn at last to the main event: the denial of class certification. We review such a decision only for abuse of discretion, "which can occur when a district court commits legal error or makes clearly erroneous factual findings." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). Though our review is deferential, it "must also be exacting" because "[a] decision to deny or grant certification can have a considerable impact on the playing field of litigation." *Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019).

A plaintiff seeking to certify a class must satisfy the four requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation—as well as one of the categories in Rule 23(b). *Orr v. Shicker*, 953 F.3d 490, 497 (7th

Cir. 2020). When certification is sought under Rule 23(b)(3), as it is here, the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The party seeking class treatment bears the burden of showing that each requirement is met by a preponderance of the evidence. *Bell*, 800 F.3d at 373.

The district court rested its denial on four grounds: commonality, typicality, predominance, and superiority. We address each in turn.

## A. Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The Supreme Court has clarified that "even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (quotation marks and alteration omitted). But merely showing that the class members "have all suffered a violation of the same provision of law" is not enough to satisfy commonality. *Id.* at 350. The claims must depend on a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The "critical point is the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (quotation marks and citations omitted).

In this case, the claims of the proposed class members all arise from the same course of conduct by the same defendant:

the County's decade-long refusal to have an oral surgeon on staff at the Jail. With no oral surgeon readily available, the class members all suffered the same alleged injury: unreasonable delays in receiving treatment for their acknowledged serious dental conditions.

The same legal standards govern every class member's claim. To recover against the County under section 1983, the class members must show that they "(1) suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority; which (3) was the proximate cause of his injury." See *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014) (alterations omitted) (quoting *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)). See generally *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Because the class members are pretrial detainees, their claims of inadequate medical care arise under the Fourteenth Amendment's Due Process Clause, which is governed by an objective-reasonableness standard. See *Miranda v. County of Lake*, 900 F.3d 335, 351–54 (7th Cir. 2018). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). A delay in medical treatment may be objectively unreasonable "if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." See *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). With these standards in mind, there is one common question of liability that will yield a common answer: whether the

County's decision not to keep an oral surgeon on the Jail's medical staff was objectively unreasonable.

As we alluded to earlier, the district court was mistaken in reading our decision in *McFields* to suggest that this question could not be resolved for the class as a whole. *McFields* is similar to this case, in that it too involved a proposed class of detainees who alleged that Cook County Jail had provided inadequate dental care in violation of the Fourteenth Amendment. The plaintiffs in *McFields*, however, challenged the Jail's "paper triage policy," whereby detainees who had dental pain were required to submit a written complaint, staff would categorize that complaint as "routine," "priority," or "urgent," and the detainee would then be referred to a dentist in anywhere from three to 30 days. 982 F.3d at 513. The plaintiffs alleged that the standard of care required the Jail to provide all detainees who submitted a complaint with a face-to-face assessment by a nurse within 48 hours. The nurse could then identify serious medical issues and dispense over-the-counter pain medication. *Id.* at 513–14. In reality, not every detainee received a face-to-face assessment within 48 hours of submitting a complaint, and so the *McFields* plaintiffs alleged that the paper triage policy was objectively unreasonable. *Id.*

On those facts, we affirmed the district court's decision to deny class certification. As relevant here, we rejected the plaintiffs' proposed common question of "whether [the paper triage policy] exposed detainees to a substantial risk of harm in violation of the Constitution." *Id*. at 515. "Answering this question in the affirmative," we reasoned, "requires McFields to prove that the policy was objectively unreasonable, but that is, by its nature, an inquiry not suitable for resolution as to all class members in one fell swoop. Rather, it is an

individualized inquiry that depends in large part on what is disclosed on each detainee's [written complaint]—when it was submitted, what type of grievance and what level of pain it reveals, and so forth." *Id.* at 516 (citations omitted).

In applying *McFields* to this case, the district court observed that whether each detainee in the proposed class received objectively unreasonable care requires us to look at individualized factors, such as the type of dental issue, degree of pain, and how long each detainee waited before receiving treatment. It then concluded that "the objective reasonableness of [the challenged] policy will depend upon circumstances unique to each individual class member."

But the district court did not grapple with (or even recognize) the salient differences between the paper triage policy challenged in *McFields* and the policy challenged here. In *McFields*, there was no uniform policy being challenged (despite the plaintiffs' contention otherwise). The plaintiffs argued that "most" detainees did not receive a timely face-to-face assessment, yet some detainees did receive such an assessment. *Id.* at 513. Their claims thus could not be construed as a systemic challenge to the County's provision of dental care. Rather, they were individualized claims of inadequate medical care that could be answered only by examining facts unique to each plaintiff.

In contrast, the Jail's decision not to put an oral surgeon on staff is a uniform policy that applies to every detainee at the Jail. And the record contains evidence showing that this policy causes systemic treatment delays for detainees who have been referred by a dentist to receive treatment from an oral surgeon. These delays were far longer than the 48-hour period at issue in *McFields*; several detainees in the proposed

class submitted grievances while awaiting treatment and received responses from Jail officials stating that appointments for oral surgery "can take 90 days or more." Scott has also presented evidence showing that high-up officials in the Jail's dental staff knew that the lack of an on-site oral surgeon caused detainees to suffer significant delays, worsening medical conditions, and gratuitous pain. In 2011, the Jail's Chief of Dental Services submitted a budget request practically begging the County to hire an oral surgeon to address the "constant[] suffer[ing]" of detainees who waited "anywhere from 2 to 3[] months to be treated" at Stroger Hospital. And in 2016, the Jail's Director of Oral Health stated in an email that the Jail was "in DESPERATE need for a part-time oral surgeon" (emphasis in original). Thus, the central question in this litigation is whether, based on this evidence, the County's decision not to hire an oral surgeon is objectively unreasonable for any detainee who has a professionally identified need for oral surgery.

We have distinguished between challenges to confinement conditions that allege gross and systemic deficiencies (which may proceed on a classwide basis) and those that allege individual claims of inadequate medical care (which may not). For example, in *Phillips v. Sheriff of Cook County*, we affirmed the district court's denial of class certification where "proof of a systemic practice" that "would lead to a finding that all detainees are effectively denied treatment" was absent, yet we noted that "Cook County's decision to staff the Jail with only one dentist might reflect a common policy of systemic deliberate indifference." 828 F.3d 541, 557–58 (7th Cir. 2016) (cleaned up) (distinguishing *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014)). And in *Orr*, we found commonality among a class of inmates who alleged that they received inadequate

medical care where "the specified policies and practices to which all … inmates are subjected … are the 'glue' that holds together the putative class; either each of the policies and practices is unlawful as to every inmate or it is not." 953 F.3d at 499–500 (quotation and alterations omitted).

Moreover, the district court overlooked the fact that, unlike in *McFields*, the proposed class in this case is narrowly defined to limit the effect of any variation between its members. In *McFields*, we explained why the variation among the proposed class members' experiences "matter[ed] immensely" for purposes of commonality:

> Suppose a detainee submits [a written complaint] of a toothache in the morning and is treated by a world-class dentist that afternoon. Or imagine that, for some reason, a perfectly healthy detainee falsely indicates extreme pain on his [complaint]. Both would fall comfortably into McFields's proposed class so long as neither was given a face-to-face assessment before receiving dental treatment, but obviously, these would-be plaintiffs have suffered no injury and have no colorable constitutional claim.

982 F.3d at 517.

These concerns are not implicated here. Like Scott, every member of the proposed class of detainees was examined by an on-site dentist who observed a serious medical issue and determined that each detainee required treatment from an oral surgeon. And all the class members experienced delays in receiving that treatment. Thus, "[t]he narrow way in which the district court defined the class[] here eliminates concern that the definitions are overbroad or include a great many

people who have suffered no injury." *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010).

To be sure, each class member eventually will have to present individualized evidence to show that the harm she suffered was causally related to the inadequate care she received. Individualized evidence may also be used to determine the amount of damages to which each class member is entitled. But we repeatedly have stressed that the common question presented need not resolve *every* issue in the case. "It is routine in class actions to have a final phase in which individualized proof [is] submitted." *Suchanek,* 764 F.3d at 756. In *Bell v. PNC Bank,* for example, employees brought a classwide challenge alleging that their former employer had an unlawful, unofficial policy of failing to pay overtime wages. 800 F.3d at 374–79. We found that whether the employer had such an unofficial policy was a common question, even though a later portion of the suit would require assessing damages for each class member on an individualized basis, as damages depended on "how many hours of off-the-clock work each employee worked or the intent of [each employee's] manager." *Id.* at 379. Similarly, in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* employees brought a classwide challenge to two employment policies that allegedly had a discriminatory impact. 672 F.3d 482, 488–89 (7th Cir. 2012). We observed that "should the claim of disparate impact prevail in the classwide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected." *Id.* at 491. Yet we found commonality because "at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful." *Id.*

The district court's analysis boils down to the fact that medical care is inherently individualized. But that alone is not enough to preclude class certification. The plaintiffs have taken aim at a specific policy (*i.e.*, the County's decision not to keep an oral surgeon at the Jail) that applies equally to all class members, and the plaintiffs have offered evidence to show that the challenged policy causes systemic delays across the entire class. That suffices to show commonality. See *Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."). The district court abused its discretion in concluding otherwise.

## B. Typicality

For similar reasons, the district court erred in concluding that individual variations among the proposed class members destroyed typicality. "[C]ommonality and typicality tend to merge." *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017). Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). That requirement may be satisfied "even if there are factual distinctions between the claims of the named plaintiffs and those of other class members[;]" it "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

There is some variation among the claims of the proposed class members in this case. We can see this in the sample of detainee grievances that Scott has presented: the class

members experienced a range of dental issues (*e.g.*, Scott needed his wisdom tooth removed, whereas J.C. needed wires removed from his mouth and T.P. needed a rotten tooth extracted); the class members experienced different periods of delay before receiving treatment (*e.g.*, Scott waited nearly 33 weeks, while others waited anywhere between four and 19 weeks); and the class members experienced different degrees of pain.

But unlike *McFields*—where the proposed class members included detainees who had submitted complaints of dental pain that had never been vetted by a professional, 982 F.3d at 517—every proposed class member here was evaluated by an on-site dentist who observed a serious medical condition and concluded that treatment from an oral surgeon was necessary. Every proposed class member then experienced a treatment delay that is allegedly attributable to the lack of an on-site oral surgeon. These are the "essential characteristics" that knit the proposed class members together. *De La Fuente*, 713 F.2d at 232.

## C.  Predominance and Superiority

Finally, we address Rule 23(b)(3)'s requirements that common questions of law or fact "predominate" over individual ones and that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1029 (7th Cir. 2018). "This requires more than a tally of common questions; the district court must consider their relative importance." *Id.*

The district court's misstep with respect to predominance and superiority flows from the same error we noted earlier: its conclusion that the question whether the County's decision with respect to an on-site oral surgeon is objectively reasonable could not be answered without individualized assessments. But, as we have explained, that question can be resolved on a classwide basis. And where a common issue exists such that its resolution "'is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is so large, to resolve th[at] issue[] in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.'" *Pella Corp.*, 606 F.3d at 394 (quoting *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003)).

The County reminds us that if the class prevails on that common issue, the class members would need to proceed in individualized trials to prove causation and to seek damages. Probably so. But that fact does not necessarily preclude class certification. *McReynolds*, 672 F.3d at 491; *Bell*, 800 F.3d at 377–79. If the district court were to determine on the merits that the County's refusal to staff an oral surgeon at the Jail passes muster, then all the class members' claims would fail together. If the plaintiffs prevail on the common issue, it will not need to be revisited in each individual proceeding. That is enough to show predominance and superiority.

## IV

We recognize that Scott's estimate of the size of the proposed class is quite large—possibly more than 2,000 members. It may be that not every member of the proposed class experienced a delay in treatment that was significant enough to amount to the denial of care; it may also be that not every

member of the proposed class submitted a grievance reporting the pain and suffering experienced while awaiting treatment. We have cautioned, however, that "[i]n circumstances such as these, involving minor overbreadth problems that do not call into question the validity of the class as a whole, the better course is not to deny class certification entirely but to amend the class definition as needed to correct for the overbreadth." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 826 n.15 (7th Cir. 2012). The district court is free to revise the class definition as it sees fit upon remand to address this issue.

We note, too, that the district court did not address whether the proposed class meets Rule 23(a)'s requirements of numerosity and adequacy of representation, which must be satisfied before the class may be certified. The parties have not briefed these issues, and so we express no view on them.

We therefore VACATE the district court's order denying class certification and REMAND for further proceedings consistent with this opinion.

KIRSCH, *Circuit Judge*, dissenting. I agree that Quintin Scott has standing to bring this appeal under our circuit's precedent. But I disagree that the district court abused its discretion in denying class certification. For that reason, I respectfully dissent.

I

Under our circuit's precedent, "the prospect of [an] incentive award [is] enough … to confer standing." *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012); see also *Weil v. Metal Techs., Inc.*, 925 F.3d 352, 357 (7th Cir. 2019) ("[T]he possibility of an incentive award … is enough of an interest to keep [a] claim justiciable."). But see *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 178 n.1 (2016) (Roberts, C.J., dissenting) ("Gomez's interest … in obtaining a class incentive award does not create Article III standing.") (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 107 (1998)).

In *Johnson v. NPAS Solutions, LLC*, the Eleventh Circuit found that incentive awards are per se unlawful, creating a circuit split. 975 F.3d 1244, 1257–59 (11th Cir. 2020), reh'g en banc denied, 43 F.4th 1138 (11th Cir. 2022); see *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("Incentive awards are justified when necessary to induce individuals to become named representatives."); *Moses v. New York Times Co.*, 79 F.4th 235, 253–54 (2d Cir. 2023) ("[T]he Eleventh Circuit [in *Johnson*] depart[ed] from this previously universally accepted consensus and create[d] a circuit split by adopting an 'outlier rule … .'") (quotation omitted); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 353 (1st Cir. 2022) ("[W]e choose to follow the collective wisdom of courts over the past several decades that have permitted these sorts of

incentive payments … ."). If we were to follow *Johnson*, Scott would not have standing.

But "[u]nless our circuit is an outlier, 'it makes little sense for us to jump from one side of the circuit split to the other.'" *United States v. White*, 97 F.4th 532, 539 (7th Cir. 2024) (quotation omitted). We are not, so "it is best to leave well enough alone." *Buchmeier v. United States*, 581 F.3d 561, 566 (7th Cir. 2009) (en banc); see also *McClain v. Retail Food Emps. Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005) ("We require a compelling reason to overturn circuit precedent," such as where prior decisions "have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling.") (quotation omitted).

## II

I disagree with the majority's finding that the district court abused its discretion in denying class certification. "We review class-certification decisions deferentially, in recognition of the fact that Rule 23 gives the district courts 'broad discretion to determine whether certification of a class-action lawsuit is appropriate.'" *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (quotation omitted). "An abuse of discretion is found only where no reasonable person would agree with the decision made by the trial court." *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006). Because there is not nearly as much daylight between this case and *McFields v. Dart*, 982 F.3d 511 (7th Cir. 2020), as the majority supposes, the district court did not abuse its discretion by relying on *McFields* to deny class certification.

As in *McFields*, Scott is seeking to certify a class to challenge the adequacy of dental care at the Cook County Jail.

McFields complained that a Jail policy resulted in systemic delays in dental care. So does Scott. In *McFields*, we concluded that whether the challenged policy was objectively unreasonable was "an inquiry not suitable for resolution as to all class members in one fell swoop." *Id.* at 516. We reasoned that objective unreasonableness was "an individualized inquiry that depends in large part on what is disclosed on each detainee's [health service request form]—when it was submitted, what type of grievance and what level of pain it reveals, and so forth." *Id.*; see also *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 608–09 (7th Cir. 2021) ("The defendants' policies may be uniform throughout the jail, but the reasonableness of those policies … still depends on the specific circumstances of the plaintiffs or class members challenging the policies.") (cleaned up). The district court acted within its broad discretion in applying parallel reasoning here because, as in *McFields*, Scott's proposed class is composed of "individualized claims of inadequate medical care that [can] be answered only by examining facts unique to each plaintiff." *Ante*, at 24.

The majority suggests that while McFields complained only of "individual claims of inadequate medical care," which may not proceed on a classwide basis, Scott alleges "gross and systemic deficiencies," which can warrant class certification. *Id.* at 25. But gross and systemic deficiencies only exist here if there are individual claims of inadequate medical care, which depends on factors such as the detainee's underlying dental issue, the degree of pain, and how long each detainee waited before receiving treatment. See *McFields*, 982 F.3d at 517 ("It matters immensely that each detainee presents a different situation that involved a different type of dental pain [and] took place at a different time …; it is precisely these sorts of dissimilarities within the proposed class that have the potential to

impede the generation of common answers apt to drive resolution of the litigation.") (cleaned up); see also *Howard*, 989 F.3d at 609 ("The policies could be reasonable for one class member …, but unreasonable for another … . Or, they could be unreasonable for both; but if they are, they are unreasonable for different legal and factual reasons.").

And the majority posits that Scott's proposed class is distinguishable from McFields's because "every member of [Scott's] proposed class of detainees was examined by an on-site dentist who observed a serious medical issue and determined that each detainee required treatment from an oral surgeon." *Ante*, at 26. But the conclusion that each proposed class member had "a serious medical issue" impermissibly reads additional language into the proposed class, which covers detainees who, "after having been referred to an oral surgeon by a dentist at the Jail, awaited treatment." A dentist may refer an individual to an oral surgeon for many different reasons with varying degrees of severity and urgency. For example, non-urgent wisdom tooth extractions would fall comfortably into Scott's proposed class. Cf. *Formica v. Aylor*, 739 F. App'x 745, 749–50, 755 (4th Cir. 2018) (affirming an award of summary judgment to jail officials because the plaintiff failed to show a serious medical condition when he experienced a delay in getting his wisdom tooth removed by an oral surgeon). Thus, even if all class members were referred by a dentist to an oral surgeon, we are still "miles from resolving the litigation on a classwide basis." *McFields*, 982 F.3d at 517.

If we were to affirm the district court's denial of class certification, plaintiffs would not be left without recourse; they can still proceed with their individual cases. See *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) ("An order refusing

to certify, or decertifying, a class does not of its own force terminate the entire litigation because the plaintiff is free to proceed on his individual claim."). And I reiterate that we review the district court's decision only for an abuse of discretion. While there are differences between this case and *McFields*, such differences are not substantial enough to conclude that "no reasonable person would agree with the decision made by the trial court." *Thomas*, 453 F.3d at 485. Under our deferential standard of review, I would not fault the district court for denying class certification. I therefore respectfully dissent.